UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JAC PRODUCTS, INC.,**  Plaintiff,  vs.  **YAKIMA PRODUCTS, INC.,**  Defendant. | **2:21-CV-10633-TGB-CI**  **ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 24, 25)** |

    This case is a business dispute between two companies who agreed to collaborate on developing and selling automobile cargo racks, bike racks and similar accessories to major car manufacturers. Although they worked well together for a time, their relationship eventually soured and their agreement terminated. Then one company, JAC Products, Inc. ("JAC") sued the other, Yakima Products, Inc. ("Yakima"), claiming that it owed post-termination sales commissions. Yakima responded that JAC was never entitled to any commissions under their agreement in the first place because the agreement contained a prerequisite for commission to become due that was never met—a signed Statement of Work.

    The Court has already once declined to grant summary judgment in Yakima's favor, concluding that a serious fact question existed at least over whether the parties mutually agreed to waive the necessity of executing Statements of Work for commissions to become due to JAC. Now, with a more fully developed record, additional fact questions have

emerged, so neither party is entitled to summary judgment. Both motions will be **DENIED.**

## I. BACKGROUND

Yakima and JAC are in the business of developing and selling specialized accessories for automobiles, including bike racks and other cargo management equipment like car-top carriers and trailer hitches. Martin Decl., ¶¶ 2-3, ECF No. 11-3, PageID.85-86. Because of the nature of their businesses, they have known each other for years and have worked together "on and off" through representative agreements and other opportunities. Ranka Dep., 26:8-19, ECF No. 25-3, PageID.641.

The endeavor central to this dispute has its origins in 2014, when the two companies began discussing joint development opportunities. Cline Dep., 49:3-51:25, ECF No. 25-4, PageID.664-65. Yakima saw value in JAC's relationships with and knowledge about automotive original equipment manufacturers (OEMs), and JAC hoped Yakima would help it to break into aftermarket sales. McGibbon Dep., 20:15-22, ECF No. 24-3, PageID.379; Cline Dep., 50:9-51:25, ECF No. 25-4, PageID.665; Ranka Dep., 29:9-21, ECF No. 25-3, PageID.641.

The initial conversations were informal and focused on JAC acting as a sales representative for Yakima. McGibbon Dep., 21:24-22:3, ECF No. 24-3, PageID.382-83. To this end, JAC drafted and proposed a simple sales representation agreement, which would entitle JAC to a 2.5% commission on all business it generated for Yakima in the first year and

2

a 2% commission thereafter. Ranka Dep. 41:4-25, ECF No. 25-3, PageID.644; McGibbon Dep., 24:12-15, ECF No. 24-3, PageID.383; Agreement, ECF No. 25-5, PageID.682-84. But the parties did not execute or move forward with this agreement because they wanted to "think bigger" and leverage one another's knowledge and experience to develop new products to sell to OEMs. McGibbon Dep., 26:18-27:12, ECF No. 24-3, PageID.385-86; Ranka Dep., 42:4-18, ECF No.25-3, PageID.645.

In June 2016, the parties formalized the written agreement at issue in this case, the "Master Joint Development Agreement" ("JDA"), "to collaborate to develop certain automotive products for use in certain O.E.M. automotive company applications and systems." JDA, ECF No. 24-2, PageID.348. Despite this articulated purpose of new product development, former Yakima Vice President of Sales Jason McGibbon acknowledges that Yakima's existing products were intended to be "part of the equation." McGibbon Dep., 27:11-12, ECF No. 24-3, PageID.386. By its terms, the agreement superseded "any prior agreements, discussions, or understandings;" there were to be no amendments without written consent. ECF No. 24-2, PageID.353.

The bulk of the agreement focused on delineating the terms of a "nonexclusive development relationship." *Id*. at PageID.349. The parties agreed that joint product development would be guided by "Statements of Work" (SOWs), which would describe "the particular project, the duties of each Party under the project, the anticipated deliverables and schedule

3

for completion." *Id.* JAC Vice President of Sales and Operations Don Cline recalled that his senior sales leader, Noel Ranka, insisted on the SOW provision based on his prior experience as an engineer. Don Cline Dep., 52:24-53:11, ECF No. 25-4, PageID.665. Ranka testified that he envisioned SOWs to act as "project screeners;" if either party wanted to propose a joint product idea, it would create a proposal for the other to review internally. Ranka Dep., 44:18-45:4, ECF No. 25-3, PageID.645. To take effect, SOWs needed to be signed by both parties. ECF No. 24-2, PageID.349.

In an addendum, "Exhibit A," the agreement set forth four specific scenarios in which the parties would work together. ECF No. 24-2, PageID.355. Two of these scenarios come into play here: "Scenario A: Current Aftermarket Accessory – no modifications" and "Scenario B: Current Aftermarket Accessory with some OEM Modifications." These scenarios contemplated commission payments *not* for JAC developing new products with Yakima, but rather for JAC acting as a sales representative for existing Yakima products. Both scenarios contain the following language, entitling JAC to a 5% commission for sales it procures on behalf of Yakima:

> When JAC Products acts as the representation of Yakima and uses its influence and sales contact to gain selling position at the OEM, JAC will be entitled to a commission of 5% of the sales price of any part sold as defined in the Statement of Work.

4

ECF No. 24-2, PageID.355.

The initial term of the agreement was four years, which would be extended for consecutive one-year periods unless either party provided written notice of an intent to terminate the agreement. ECF No. 24-2, PageID.351. The agreement contained a survival-of-obligations clause in the event of termination, which provided that the parties' rights and obligations would survive termination unless they agreed otherwise:

> Except as otherwise provided in this Agreement, each Party's rights and obligations that accrued before the effective Date of termination will survive the expiration and termination of this Agreement, including where applicable, for the duration of the life of the part or vehicle program, including service parts.

ECF No. 24-2, PageID.352.

JAC and Yakima both agree that no Statements of Work as described in Scenarios A and B were ever executed. Nevertheless, JAC began acting as Yakima's sales representative, setting up meetings, organizing tech shows, and including Yakima products in its show rooms and brochures. Ranka Dep., 43:14-20, ECF No. 25-3, PageID.645. The parties agree that, through these efforts, JAC introduced Yakima to three OEMs: Ford, Nissan, and FCA/MOPAR. Ranka Dep., 46:4-52:8, ECF No. 25-3, PageID.646-47. JAC also initiated follow up meetings with these companies to pursue sales contracts on Yakima's behalf. Ranka Dep., 49:1-6, ECF No. 25-3, PageID.646.

5

Email messages between the two companies show that they had discussions regarding the calculation of commissions to JAC based on sales made by Yakima to these OEM companies. Email Regarding Commissions, ECF No. 24-8, PageID.582. During discovery, Yakima Director of Sales Eric Roesinger evidently generated a list of contracts he believed were the result of JAC's efforts under the JDA, though none of those contracts have been made a part of the record. Roesinger Dep., 84:9-16, ECF No. 24-3, PageID.443. JAC V.P. Cline also generated a list of part numbers and products he believes were subject to the JDA, but that list similarly is not in the record. Cline Dep., 26:6-32:25, ECF No. 25-4, PageID.659-60.

There is no dispute that, between 2018 and 2020, Yakima paid some commissions to JAC for some sales that JAC facilitated. Yakima now characterizes these payments as "good-faith payments around the scenarios that [it] thought these projects applied to" at a time when JAC was actively representing and managing the accounts. Roesinger Dep., 41:1-2, ECF No. 24-6, PageID.571. According to Yakima, it assumed there were "two parts" to commissions under the Scenario A equation: "One part being helping to facilitate … introductions and the discovery work to, ultimately, be awarded the business, so to speak, but then the second part would be an ongoing management of that relationship." McGibbon Dep., 31:7-12, ECF No. 24-3, PageID.390. Yakima's corporate controller, Emily Davis, testified that she was told to pay JAC 5% of net sales to

6

Nissan and Ford under the agreement; there were no commission payments for sales to FCA/MOPAR, however, because Yakima invoiced JAC directly for those products, and JAC marked them up on its own to collect a profit. Davis Dep., 109:2-110:3, ECF No. 24-3, PageID.468-69.

The parties further agree that Yakima's commission payments to JAC occurred under the JDA because there were no other agreements in place between them. McGibbon Dep., 41:16-23, ECF No. 571. Yakima admits that it did not insist on executing SOWs before making the payments, issue directives that the payments should cease because of the lack of SOWs, or demand a refund of any payment it made as improper. McGibbon testified, "I don't know that … I would say we 'waived' [the SOW obligation]. It just simply … was not enforced." McGibbon Dep., 68:20-69:4, ECF No. 24-3, PageID.427-28.

In early 2019, after Yakima's main contact at JAC, Kevin Kozole, left the company, the relationship between JAC and Yakima soured. Grabenstein Decl., ¶¶ 2-4, ECF No. 27-1, PageID.870. According to McGibbon, Yakima became concerned that JAC was no longer actively involved in its sales: one representative attested that 24 of the 25 award letters received from Ford after Kozole's departure involved no participation by JAC; another testified that "additional SKUs … were added to the Ford assortment during that period." McGibbon Dep., 61:17-20, ECF No. 24-3, PageID.420; Grabenstein Decl., ¶¶ 6-7, ECF No. 27-1, PageID.871; Wood Dep., 31:8-11, ECF No. 24-4, PageID.506.

7

When the company began discussing its dissatisfaction with JAC's performance internally, Yakima became "reminded of the fact that there was not a statement of work we could refer back to." McGibbon Dep., 45:13-16, ECF No. 24-3, PageID.404. JAC, for its part, felt that the agreement was one-sided and was frustrated that Yakima had rejected each one of JAC's joint product development ideas. Ranka Dep. 53:7-54:1, ECF No. 25-3, PageID.547-48. JAC says that, in addition to this, its quality scores began suffering because Yakima was not delivering the products JAC was tasked with funneling to FCA/MOPAR on time.[1] Ranka Dep., 55:18-56:25, ECF No. 25-3, PageID.648.

After Yakima gave notice of its intent to terminate the JDA in April 2020, JAC sought "tail commissions for certain sales and the contracts subject to those commissions." ECF No. 12, PageID.139; Martin Decl., ¶ 9, ECF No. 25-2, PageID.620. According to Ranka, these commissions were expected to continue for the life cycles of the products for which JAC had facilitated sales:

> My understanding was it would be life of contract for the products. So, the intent was that if the product continued to ship—almost every contract we do in the OE world is life of product. So, if we sell something and it goes into a product cycle and it sells for five years, our expectation is to get commissions on all five years.

---

[1] According to JAC, FCA/MOPAR continues to back charge JAC and Yakima for late shipments to this day. Cline Dep., ECF No. 25-4, PageID.655.

8

Ranka Dep. 62:19-25, ECF No. 25-3, PageID.650.

But JAC's efforts to attempt to collect commissions were rebuffed. Through a letter from counsel dated October 20, 2020, Yakima asserted that "JAC Products is not entitled to any further or additional payments" because the JDA had expired—and that in fact it *owed* thousands of dollars to Yakima for sales to FCA/MOPAR. ECF No. 12-3, PageID.169.

The impasse led to this lawsuit, which was originally filed in Oakland County Circuit Court and then removed to federal court. ECF No. 1. In its complaint, JAC asserted claims against Yakima for breach of contract and violation of the Michigan Sales Representative Act, MCL § 600.2961, seeking "all sales commissions stemming from contracts as between FCA/MOPAR, Ford Motor Company, and Nissan, respectively, and Defendant for which Plaintiff is the procuring cause, as well as an award of two (2) times the amount of commissions due or $100,000, pursuant to MCL 600.2961(5)(b)." ECF No. 1, PageID.13

Shortly after the complaint was filed, Yakima moved for summary judgment, contending that discovery was unnecessary because the dispute focused solely on contract interpretation. While conceding that it made some payments to JAC, it argued that JAC was never entitled to *any* commissions under the JDA because the condition precedent for these commissions to become due—signed SOWs—was never satisfied. ECF No. 11-1, PageID.79. The Court agreed with Yakima that the JDA unambiguously anticipated commission payments only for parts defined

9

in SOWs. But JAC provided some evidence suggesting that the parties mutually waived the signed SOW requirement by exchanging unsigned SOWs electronically, so the Court concluded that summary judgment was inappropriate. ECF No. 20.

With discovery now complete, JAC and Yakima have filed cross motions for summary judgment.

## II. LEGAL STANDARD

"The fact that the parties have filed cross-motions for summary judgment does not mean … that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 447 (6th Cir. 2003). Instead, the Court must apply the well-recognized summary judgment standards in evaluating both motions.

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

10

(1986). But that party must "show that [it] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

### III.  ANALYSIS

Given the forum selection clause in the JDA, Michigan law governs this dispute. Under Michigan law, a plaintiff must establish three elements to prevail on a breach of contract claim: 1) that a contract exists; 2) that the defendant breached the contract, and 3) that damages were suffered as a result of the breach. *Miller-Davis Co. v. Ahrens Constr. Inc.*, 848 N.W. 2d 95, 104 (Mich. 2014).

JAC argues that it is entitled to summary judgment because there is no genuine dispute that Yakima breached the JDA by failing to pay post-termination commissions on its sales to Nissan, FCA/MOPAR, and Ford. ECF No. 24, PageID.331-32. Because Yakima had no relationships with those companies before the JDA, JAC views contracts "procured for Yakima between itself and the aforementioned OEMs" during the life of the JDA as subject to the 5% commission provided for by "Scenario A" in the JDA. *Id.* at PageID.332. Pointing to the "survival of obligations" clause, JAC insists that Yakima owes commissions on continuing sales from those contracts while they remain in effect. *Id.* at PageID.331-32.

Yakima, meanwhile, argues that there is no genuine dispute that none of its sales were covered by the JDA. ECF No. 25, PageID.610.

11

Pointing to the JDA's clause providing that JAC's commission would be "5% of the sales price of any part sold as defined in the Statement of Work," it emphasizes that the parties agree they neither prepared, exchanged, nor executed any SOWs. *Id.* And because there are no SOWs, it asserts that reading the JDA to require commission payments to JAC without any SOWs is untenable because there is nothing guiding what parts, projects, or customers would entitle JAC to commissions. *Id.* at PageID.611-12.

Because the respective positions of the parties turn on a number of unresolved factual questions, neither has established an entitlement to summary judgment.

### *A. Contract Language*

The parties agree that a valid contract existed between them: the JDA. The dispute revolves around how to interpret it. Under Michigan law, the goal of interpreting a contract is to honor the parties' intent. *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994). If a contract's language is unambiguous, the Court must apply its terms as written. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 1999). Ambiguous language, however, is a question for a factfinder. *Kurshat v. Gen. Bearing Corp.*, No. 04-40281, 2007 WL 1018225, at *8 (E.D. Mich. Jan. 9, 2007).

At first glance, these principles appear to resolve the case in Yakima's favor. As the Court noted in its prior order, there is no apparent

ambiguity in the JDA's text: it unambiguously anticipates payments only for parts sold that are defined in an effective (*i.e.*, signed) SOW. JAC's proposed interpretation improperly reads out the express requirement of a SOW for commissions to become due. But the inquiry does not end there because JAC contends that Yakima waived its right to assert that SOWs were required. ECF No. 24, PageID.339-43; ECF No. 26, PageID.826-31.

### *B. Waiver*

In Michigan, contracting parties are free to modify or waive their contractual rights and duties, notwithstanding any "restrictive amendment" clauses that would otherwise bar such amendment without written consent—such as the one in the JDA. *Quality Prods. & Concepts Co.*, 666 N.W.2d at 256-57. But a party asserting waiver must show "a mutual intention of the parties to waive or modify the original contract … including [any] restrictive amendment clauses." *Id.* at 258.

The Michigan Supreme Court has held that mutuality must be established through clear and convincing evidence of mutual intention to waive the terms of the original contract:

> The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract. In meeting this clear and convincing burden, a party advancing amendment must establish that the parties mutually intended to modify the *particular* original contract, including its restrictive amendment clauses such as written modification or anti-waiver causes.

13

*Id.* (emphasis in original). Mere knowing silence is generally not enough. *Id.* at 254. But "[w]hen a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied." *Id.* at 258.

Yakima offers several arguments against finding waiver. Leaning heavily into this Court's conclusion from its prior order in this case that "commission payments are only available for a 'part sold as defined in the Statement of Work,'" it asserts that—while it may have waived its right to require *signed* SOWs—it could not have waived the SOW requirement altogether because SOWs are necessary to identify what products and sales are eligible for commissions. ECF No. 27, PageID.864; ECF No. 20, PageID.293. It further suggests that, without SOWs, there is nothing to stop JAC from claiming commissions on every product Yakima sells to any of its customers in perpetuity. ECF No. 25, PageID.611-12.

But Yakima overreads the Court's prior order. The Court noted only that in any dispute involving commission payments there is a necessary first question: upon what item or items will commissions be paid? ECF No. 20, PageID.293. At that stage in the case, it appeared from the JDA's language that the parties intended this question to be answered solely by reference to SOWs. With a more fully developed record, however, Yakima's argument that—without SOWs—there is no way to identify which sales are subject to commissions fails to convince. The record

14

establishes that, while the parties did not make any particularized lists part of the summary judgment record, both Yakima and JAC representatives were able to identify specific contracts and create spreadsheets of SKU numbers which they believed were subject to the JDA. Roesinger Dep., 84:9-16, ECF No. 24-3, PageID.44; Cline Dep., 26:6-32:25, ECF No. 25-4, PageID.659-60. The argument that there are no outside bounds to JAC's request for commissions is thus not well-taken.

Noting that courts are generally reluctant to find an implied waiver of contractual rights—*i.e.*, waiver through conduct rather than express agreement—unless "no other reasonable explanation is possible," Yakima further contends that JAC has not identified any conduct establishing an *intentional* waiver. ECF No. 27, PageID.865. And, it says, JAC has made no effort to address the JDA's provision prohibiting amendment absent express written agreement. *Id.* at 866.

But JAC's evidence creates fact questions over these issues. Yakima admits that it knew for several years that it was making commission payments to JAC related to certain sales to Ford and Nissan—and believed the JDA governed them because there were no other agreements between the parties. Despite the lack of any SOW, Yakima discussed the calculation of those payments with JAC over email. At no point did Yakima insist on refunds, demand SOWs, or issue any directives that commissions should not be paid out to JAC. Rather, Yakima *continued* paying commissions until the JDA expired. It was only when Yakima

15

became dissatisfied with its partnership with JAC that it became "reminded" about the SOW requirement. And even then, it did not raise the issue with JAC. In McGibbon's words, "I don't know that … I would say we 'waived' [the SOW obligation]. It just simply … was not enforced." McGibbon Dep., 68:20-69:4, ECF No. 24-3, PageID.427-28.

This conduct goes beyond mere silence. Viewing it in the light most favorable to JAC, a reasonable factfinder could conclude that it amounts to clear and convincing evidence that Yakima intentionally waived both the contractual SOW requirement and the requirement that changes to the JDA needed to be in writing. *See Roudabush v. Lippert*, No. 253347, 2005 WL 1705627, at *2 (Mich. Ct. App. July 21, 2005) (defendant's knowing failure to invoke disputed contractual provision for years created fact question over whether he waived it); *see also Olga's Kitchen v. Papo*, 815 F.2d 79 (Table), 1987 WL 36385, at *4 (6th Cir. Feb. 16, 1987) (lessor may have waived both timeliness and "no waiver" provisions of contract by accepting late rental payments for several years). If the intentional waiver were so found, the jury would then need to consider whether JAC could establish by a preponderance of the evidence that Yakima breached the parties' modified contract when it elected to stop paying commissions after the contract terminated.

Nonetheless, this same conduct is not enough to establish that JAC is entitled to summary judgment. As Yakima is keen to point out, waiver is the "voluntary and intentional abandonment of a known right." *Quality*

16

*Prods. & Concepts Co.*, 666 N.W.2d at 251. The record contains testimony from McGibbon that Yakima "wouldn't say" it waived the SOW provision, even though it did not insist on its enforcement. Instead, Yakima testifies that it viewed the payments it was making to JAC as "good faith" payments for active management of Yakima's Ford and Nissan accounts while the parties worked to jointly develop products in the spirit of the JDA. This testimony is sufficient to create a fact question over whether the parties mutually agreed to waive the express SOW requirement in their contract. Viewing it in the light most favorable to Yakima, a reasonable juror could conclude that Yakima did not intentionally abandon any of its contractual rights—and thus, that it is not liable for breach of contract because none of the sales for which JAC now seeks commissions fall within the scope of the JDA.

### *C. Damages*

A plaintiff in a breach-of-contract case has the burden of proving "damages with reasonable certainty, and may recover only … damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc. v. Krol*, 667 N.W.2d 379, 383 (Mich. Ct. App. 2003).

Material fact questions about damages also preclude summary judgment for either party. Viewed in the light most favorable to JAC, the record suggests that JAC has suffered readily ascertainable damages. As JAC notes in a reply brief, Yakima appears to know which products and contracts were subject to the JDA; indeed, representatives from both

17

companies appear to be able to identify those products and contracts. But there is no evidence in the record that these sales are continuing from which the Court could infer that JAC has suffered actual injury in a sum-certain amount.

Yakima, for its part, asserts that it is entitled to summary judgment at least with respect to FCA/MOPAR sales because it is undisputed that it sells parts directly to JAC rather than to FCA/MOPAR. On this point, the Court agrees. ECF No. 25, PageID.612. JAC concedes that "Yakima sells its existing off-the-shelf products to JAC, who in turn adds a 5% markup and sells the product to MOPAR." ECF No. 26, PageID.831. Indeed, according to JAC, "JAC has and continues to collect[] its commissions in this manner without any executed Statements of Work." *Id*. Given this concession, JAC has no reasonable prospect of proving it is owed any commissions which it has not received as a result of sales to FCA/MOPAR. JAC therefore cannot proceed to trial on a theory that Yakima breached the JDA by failing to pay commissions on sales to FCA/MOPAR.

### D. *Procuring Cause Doctrine*

JAC additionally argues that, even if it is not entitled to commissions under the JDA, it is entitled to post-termination commissions under Michigan's "procuring cause" doctrine. ECF No. 24, PageID.334. In general terms, this doctrine provides that "a sales representative is entitled to commissions, including post-termination

18

commissions, on sales he generated." *Pfam, Inc. v. Ind. Tube Corp.*, No. 06-11015, 2006 WL 3313772, at *4 (E.D. Mich. Nov. 15, 2006) (citing *Reed v. Kurziel*, 89 N.W.2d 479, 482-83 (Mich. 1958)).

But the "procuring cause" doctrine applies only where the parties' contract is silent as to post-termination commissions or obligations; it cannot alter the terms of an existing agreement as to the payment of post-termination commissions. *APJ Assocs. Inc. v. N. Am. Philips Corp.,* 317 F. 3d 610, 616 (6th Cir. 2003). And here, the JDA plainly contains a survival-of-obligations clause, which provides that "each Party's rights and obligations that accrued before the effective Date of Termination will survive the expiration and termination of this Agreement, including, where applicable, for the duration of the life of the part or vehicle program, including service parts." JAC's breach-of-contract claim thus depends wholly on its ability to show that Yakima waived the JDA's SOW requirement, such that the contract was modified to entitle it to commissions in the absence of SOWs. If JAC cannot establish waiver, it cannot turn to the procuring cause doctrine to save its claim. *See Muqtadir v. Micro Contacts, Inc.*, 148 F. App'x 348, 352 (6th Cir. 2005).

### *E. Michigan Sales Representative Act*

Finally, the parties dispute whether either is entitled to summary judgment on JAC's claim under the Michigan Sales Representative Act, MCL § 600.2961. ECF No. 25, PageID.614. This claim is a derivative of a breach-of-contract claim; "if there is no liability on the contract claim for

19

sales commissions, there is no corresponding violation of the Act." *Hardy v. Reynolds & Reynolds Co.*, 311 F. App'x 759, 766 (6th Cir. 2009). In other words, the Act does not independently create a duty of pay post-termination commissions. *Miller v. Hinkle Mfg, LLC*, No. 13-CV-14048, 2014 WL 5307145, at *6 (E.D. Mich. Oct. 16, 2014) (Drain, J.).

It remains unclear whether Yakima waived any contractual rights, such that JAC has not received commission payments to which it is entitled under the JDA. This factual dispute must be resolved before it is possible to determine whether there is any corresponding violation of the Michigan Sales Representative Act. If Yakima is found to have waived the SOW requirement and to have breached the JDA by failing to pay commissions, then JAC has a claim under the Act. But if a factfinder concludes that Yakima has not waived the SOW requirement or breached the JDA, then this claim fails.

Summary judgment is therefore not appropriate.

## IV. CONCLUSION

For the reasons explained above, the parties' Motions for Summary Judgment are **DENIED.**

**IT IS SO ORDERED** this 31st day of March, 2023.
BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge